**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SLT
F.# 2010R01661

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

July 13, 2011

<u>By ECF and Hand Delivery</u>

The Honorable Andrew Carter
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York

        Re:  United States  v. Gjavit Thaqi et al.
             <u>Criminal Docket No. 11-486 (S-1)(DLI)</u>

Dear Judge Carter:

        The government respectfully submits this letter in anticipation of the initial appearances and bail determinations for defendants scheduled to be arraigned on July 13, 2011 in the above-captioned matter.  The defendants are collectively charged in an eleven count indictment with operating a continuing criminal enterprise ("CCE"); conspiracies to import, distribute and possess with intent to distribute in excess of 1,000 kilograms of marijuana; conspiracies to import, export and distribute more than 5 kilograms of cocaine; conspiracy to distribute oxycodone; conspiracy to launder the proceeds of narcotics trafficking; and using firearms during and in relation to drug trafficking crimes.

        The government moves for a permanent order of detention with respect to the defendants GJAVIT THAQI, also known as "Doc," SHKELQIM BAKRAQI, also known as "Juicehead" and "Avnia," JOHN CEKAJ, MARTINO CEKAJ, also known as "Marty," GIOVANNI DIFUCCIA, BRIAN DUBLYNN, also known as "Big Brian" and "Brian Dubbs," ARVY EBRAHIME, ANGELO GERMANO, also known as "Fat Ange," JETON GJIDIJA, also known as "Tony G," LEE KARAQI, ROBERT KARAQI, HASAN KURTI, also known as "Ozzie," SELMAN LAJQI, also known as "Simon," ALESSANDRO LATINO, NIKOLA LUKAJ, also known as "Nick," NICHOLAS MASI, FATMIR MEHMETI, also known as "Lucky," FAIK MEHMETI, also known as "Frank Nitti," NEFAIL MEHOVIC, also known as "Nef" and "Little Guy," MAL REXHA, DARIUS RIVERA, ROBERT RUDAJ, also known as "Doka Rudaj," LANCE SCHONER, LESTER ZABORSKI and AGRON ZENELAJ, also known as "Paddy" and "Jimmy."  Each of

these defendants face significant jail time; have access to substantial amounts of untraceable cash; make frequent international travel and have strong overseas ties; and are all members and associates of an international criminal organization that has repeatedly threatened witnesses, obstructed justice and engaged in wanton acts of violence in furtherance of their illegal activities.  Accordingly, the defendants present a serious risk of flight and danger to the community that cannot be mitigated by any condition or combination of conditions.

With respect to the defendants ROBERT BONURA and MAGDALENA NIKOLLAJ, the government requests a substantial bond secured by real property, the signature of multiple responsible suretors and strict home detention with electronic monitoring.[1]

I.   FACTUAL STATEMENT

The government proffers the following facts in support of its motion for a permanent order of detention.[2]

## The International Organized Crime Syndicate

Since 2007, the New York Organized Crime and Drug Enforcement Strike Force ("OCDESF")[3] has been investigating a massive international drug trafficking syndicate led by ethnic Albanians in the United States, Canada and Europe (the "Syndicate").  At its core, the Syndicate is composed of several inter-related ethnic Albanian family clans ("fis") with hundreds of associated members, workers and customers spanning three

---

[1] The remaining defendants in the indictment are already in custody for previous crimes or were arrested outside the Eastern District of New York and are scheduled to be arraigned in the federal districts in which they were arrested.

[2] See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same).

[3] The Strike Force comprises agents and officers of the Drug Enforcement Administration ("DEA"); New York City Police Department ("NYPD"); Immigration and Customs Enforcement, Homeland Security Investigations ("ICE/HSI"); New York State Police ("NYSP"); Internal Revenue Service ("IRS"); United States Marshals Service; and the United States Attorney's Office.

continents.  In operation for more than a decade, the Syndicate is responsible for organizing the importation and distribution of tens of thousands of kilograms of hydroponic marijuana from Canada, Mexico, California, Georgia, Colorado and Florida; substantial quantities of MDMA from the Netherlands and Canada; hundreds of kilograms of cocaine from Mexico, Colombia, Venezuela and Peru; and large quantities of diverted prescription pills such as oxycodone.  Syndicate members distribute the narcotics throughout New York and other parts of the United States, Canada and Europe.

While the leadership structure of the Syndicate does not appear to be strictly hierarchical, and the roles of specific members has shown fluidity and a tendency to rise and fall over time, the investigation has revealed that GJAVIT THAQI, also known as "Doc," ARIF KURTI, also known as "the Bear," "Arty" and "Nino," and GJEVELIN BERISHA, also known as "Jev," are high-level leaders and organizers in the Syndicate with significant decision-making authority.  For more than ten years ARIF KURTI and GJAVIT THAQI have coordinated and controlled major aspects of the Syndicate's international narcotics activities.  KURTI is currently serving a five-year sentence in an Albanian prison following his conviction for heroin trafficking, but continues to direct Syndicate operations through his use of smuggled cellular telephones and blackberry devices to communicate instructions to underlings, including his brother, HASAN KURTI, also known as "Ozzie," and cousin, GJAVIT THAQI.

GJAVIT THAQI, the cousin of ARIF KURTI and HASAN KURTI, is the Syndicate's primary representative in the United States and organizes a large portion of the Syndicate's trafficking of illegal narcotics into and through the United States.  THAQI also controls drug distribution cells throughout all five boroughs of New York City and Albany.  Brothers BAJRAM LAJQI, also known as "Brian Lajqi," and "Van Damme," and SELMAN LAJQI, also known as "Simon," and their nephew SHKELQIM BAKRAQI, also known as "Juicehead" and "Avnia," directed the importation of marijuana and other controlled substances into the United States in coordination with Syndicate members in Europe and Canada. Collectively, these Syndicate members are responsible for importing tens of thousands of kilograms of marijuana into the United States, most of which is smuggled from Canada and Mexico hidden in tractor trailers loaded with seemingly legitimate goods.  Each tractor trailer would typically carry hundreds of pounds of marijuana, with some loads containing as much as 1,200 pounds of illegal narcotics.  The marijuana shipments were stored in warehouses and stash locations throughout Brooklyn, Queens and the Bronx, and then distributed throughout the New York metro

3

area.

In addition to controlling the importation and
distribution of marijuana in the United States, ARIF KURTI,
GJAVIT THAQI, GJEVELIN BERISHA and other Syndicate members,
including BRIAN DUBLYNN, also known as "Big Brian" and "Brian
Dubbs," coordinated the shipment of cocaine from the United
States to Canada and Europe.  Specifically, they obtained
kilogram quantities of cocaine from sources in the United States
and exported the cocaine to Europe by concealing the drugs inside
luxury automobiles that were fitted with hidden compartments and
shipped to Albania and other ports in Europe under auspices of
seemingly legitimate car dealerships controlled by Syndicate
members.

At the time of his arrest, THAQI was involved in
negotiations to obtain hundreds of kilograms of cocaine from
sources in South America for transport to Canada and Europe
(through the United States).  In particular, the investigation
revealed THAQI's negotiations for numerous multi-kilogram cocaine
transactions, including, but not limited to: a shipment of 100
kilograms of cocaine from Colombia to New York, which THAQI then
planned to break up into smaller shipments and smuggle into
Canada to be exchanged for high-grade hydroponic marijuana; a 100
kilogram shipment of cocaine from South America to Albania;
regular shipments of cocaine from Florida to New York
orchestrated in connection with co-conspirators NIKOLA LUKAJ and
JOSEPH BEVILACQUE; and THAQI's continuing efforts to set up a
steady pipeline to supply 40 kilograms of cocaine per month, for
distribution by associates of ARIF KURTI in Madrid, Spain.

For the last year, THAQI and other Syndicate members
have also been obtaining large shipments of Oxycodone pills
diverted from pain clinics in Florida by criminal associates
including ANGELO GERMANO, also known as "Fat Ange."  NICHOLAS
MASI provides financial backing for many of THAQI's narcotics
ventures and also acts as a distributor under THAQI.

GJEVELIN BERISHA formerly headed one of the larger
Syndicate distribution cells in New York.  BERISHA and his group
smuggled massive quantities of marijuana from Canada and
California into the New York area.  They also distributed
kilogram quantity amounts of cocaine in New York to fund their
marijuana purchases.  In the Spring of 2010, BERISHA sent one of
his workers to Peru to obtain cocaine for the Syndicate.  The
courier, EMILJAN REXHA, was arrested at Lima airport in
possession of clothing saturated with 24 kilograms of liquid
cocaine.  The courier's father, MAL REXHA, is a truck driver

4

employed by the Syndicate primarily to transport tractor trailer loads of marijuana and drug proceeds between California and New York.  BERISHA was arrested on June 8, 2010 by FBI agents on an unrelated case.  At the time of his arrest, agents recovered drug ledgers, $29,000 in cash and a loaded firearm.  Since BERISHA's arrest, other members of his cell have continued to obtain and distribute large quantities of marijuana and cocaine, including FAIK MEHMETI, also known as "Frank Netti," FATMIR MEHMETI, also known as "Lucky," MARTINO CEKAJ, JOHN CEKAJ, and SHKELQIM BAKRAQI.

Other wholesale distributors working for the U.S.-based distribution cells of the Syndicate include, among others: JETON GJIDIJA, also known as "Tony G," NIKOLA LUKAJ, ROBERT RUDAJ, also known as "Doka Rudaj," HASAN KURTI, VALTER MEMIA, also known as "Pavlo Codenotti," ROBERT KARAQI, LEE KARAQI, NEFAIL MEHOVIC, also known as "Nef," AGRON ZENELAJ, also known as "Paddy" and "Jimmy," LESTER ZABORKSI, GIOVANNI DIFUCCIA and ARVY EBRAHIME.

IBRAHIM KURTI, also known as "Big Brian," is the younger brother of ARIF KURTI and HASAN KURTI.  From 1999 through 2002, IBRAHIM KURTI was involved with his brothers in the large-scale importation and distribution of MDMA from Europe to the United States; the importation and distribution of marijuana from Canada; and the exportation of cocaine to Europe.  KURTI was arrested in late 2002 in the Southern District of New York and charged with marijuana and MDMA distribution.  Following his arrest, KURTI identified one of the cooperating witnesses against him and Syndicate members threatened to murder the witness if he/she testified.  Despite the attempted intimidation and/or elimination of witnesses, KURTI was eventually convicted and sentenced to 27 years in prison.  While in prison, KURTI has continued to assist the Syndicate by arranging for introductions between Syndicate members and drug contacts KURTI made both before his arrest and since being incarcerated.  Most recently, within the last few months, IBRAHIM KURTI arranged for HASAN KURTI to obtain marijuana from a supplier IBRAHIM met while in prison.

DARIUS RIVERA and DAVID MCLEAN are workers who ran marijuana stash houses in Brooklyn, New York.  Two of these warehouses were raided by federal agents during the course of the investigation, resulting in the seizure of hundreds of pounds of hydroponic marijuana.

HECTOR FLORES is a Florida-based marijuana broker who obtained marijuana that was transported from grow houses in Florida to New York by Syndicate members.

MAGDALENA NIKOLLAJ, also known as "Magdalena Karaqi," (THAQI's wife and the sister of ROBERT, AL and LEE KARAQI) and LAURETTA LOKAJ (THAQI's ex-wife and current wife of VALTER MEMIA) were primarily responsible for laundering drug proceeds for the Syndicate by transporting bulk cash and/or wiring money to co-conspirators in Canada.  LOKAJ also distributed oxycodone for the Syndicate and had her own customer base.

The investigation further revealed that the Syndicate employed the services of a Canadian-based professional money laundering organization.  Members of this organization include, among others: LANCE SCHONER, ROBERT BONURA and ALESSANDRO LATINO. In just the past year, this group is responsible for laundering more than fifteen million dollars in narcotics proceeds.  The group picks up money in New York that represents the proceeds of marijuana sales and then transports that money to the Canadian sources of supply through bulk cash smuggling.  In addition, members of the group also send millions of dollars in marijuana proceeds to co-conspirators on the West Coast of the United States, who use the proceeds to purchase cocaine that was smuggled into the country by Mexican drug cartels.  The cocaine is then transported across the border into Canada, where it is sold at enormous profit - most of which is used to fund subsequent marijuana purchases.  SCHONER and BONURA were responsible for collecting drug proceeds from marijuana distributors on Long Island and the five boroughs of NYC. SCHONER then arranged to have the bulk cash transported to ALESSANDRO LATINO and other co-conspirators in California, where it was used to fund cocaine purchases.

## Acts of Violence

The investigation has further revealed that the Syndicate regularly employs violence or threats of violence to conduct its illegal activities.  Many Syndicate members routinely carry loaded firearms and use them to protect their drugs and money, rob rivals, forcibly collect drug debts and intimidate or eliminate potential witnesses against them.  The below-described incidents are only a small number of the violent escapades committed by Syndicate members:

On May 15, 2005, BAJRAM LAJQI, ALBERTO MERCADO and several other co-conspirators kidnaped an Albanian associate who lost $1 million dollars of the Syndicate's drug proceeds.  They brought him to the basement of a house, tied him up, put plastic tarp down on the ground, pointed a gun at his head and threatened to kill him if he didn't pay them back the money.  After hours of interrogation and death threats, the victim agreed to sign over

the deeds to several properties he owned in order to cover the debt.  One of the co-conspirators was eventually convicted of extortion and kidnapping in New York State Supreme Court. Following his prison sentence, he was deported to Albania where he was subsequently murdered.

On January 24, 2008, MARTINO CEKAJ and two other co-conspirators attempted to murder a victim and 2 of his friends outside the Tosca Café (a bar/restaurant in Bronx, New York) in retaliation for the victim's perceived cooperation with law enforcement.  One of the assailants approached the victim, took out a handgun and proceeded to "pistol-whip" the victim in the head.  When the gun impacted the victim's head, however, it accidentally discharged and hit on of the combatants.  MARTINO CEKAJ then pulled out his own pistol and began firing indiscriminately at the three victims, hitting one of them with multiple shots.  CEKAJ and his co-conspirators were arrested and prosecuted for attempted murder, gang assault and firearm possession in Bronx Criminal Court.  All three defendants were acquitted of the State charges after Syndicate members threatened the victim, who disappeared shortly before he was expected to testify at trial.

On October 2, 2010, agents intercepted wiretap calls in which NIKOLA LUKAJ announced his intention to retrieve a firearm and instructed a co-conspirator to come with him to rob a drug customer who owed them an outstanding drug debt.  At the direction of OCDESF agents, NYPD officers subsequently conducted a traffic stop of LUKAJ and retrieved a loaded firearm from the trunk of his vehicle.  Shortly after being released on bond, under the mistaken impression that he could not be prosecuted for the firearm possession if the NYPD didn't have his car, LUKAJ had one of his underlings break into the NYPD impound yard and steal his vehicle back.

On February 10, 2011, BAJRAM LAJQI, FATMIR MEHMETI, FAIK MEHMETI and another Syndicate member were inside a Bronx bar when they noticed a clean-cut male watching them from across the bar.  Believing that the man was an undercover police officer, all four Syndicate members proceeded to violently punch and kick the victim until bouncers tried to intervene and break up the fight.  LAJQI then pulled out his firearm and pointed it at the bouncers until they backed off.  The four assailants fled the scene together.

On June 4, 2011, a dispute between BAJRAM LAJQI and a drug trafficking associate over the payment of a drug debt escalated to the point that LAJQI decided to have the associate

killed.  LAJQI and his henchman CARLOS ALVAREZ tracked their
victim to Tosca Café, stalked him for almost two hours, slashed
all four tires of his vehicle and planned to murder him after he
tried to drive away and then realized his tires were flat.  LAJQI
and ALVAREZ eventually got tired of waiting for the victim to
leave, however, so they followed him into Tosca Café, where LAJQI
proceeded to blind-side the victim with a punch and then pull out
his gun intending to shoot the victim in the middle of the
crowded bar.  A bouncer intervened momentarily, which allowed the
victim to run out the door and into the street.  LAJQI and
ALVAREZ chased the victim out of Tosca Café and down the street,
firing multiple shots at him.  Despite bullet wounds in both
legs, the victim managed to evade the would-be killers, who fled
the scene in opposite directions.

        Following the shooting, SELMAN LAJQI and BAJRAM LAJQI
discussed sending someone to finish the job but were unable to do
so because the NYPD had stationed a patrol car outside the
victim's residence for several days after his return from the
hospital.  LAJQI and ALVAREZ were subsequently arrested on June
8, 2011.  After the arrests of LAJQI and ALVAREZ, SELMAN LAJQI
threatened to kidnap the victim's family in Kosovo if he
cooperated with authorities.  Syndicate member SHKELQIM BAKRAQI
then advised the victim that the Syndicate would pay him a large
sum of cash if he agreed not to cooperate with the authorities.
In response, the victim indicated that he would flee the country.
Despite this assurance, Syndicate members MARTINO CEKAJ, FAIK
MEHEMTI and FATMIR MEHMETI believed that the victim was too great
of a risk because he had worked directly with them for many years
and could potentially cripple their group if he cooperated.
Accordingly, they made preparations to go forward with the murder
plot, which was sanctioned by Syndicate leaders.  The defendants
were arrested before the execution could be accomplished.

        On the morning of July 13, 2011, federal agents
executed search warrants on several Syndicate-controlled stash
houses and residences, recovering eighteen firearms and hundreds
of rounds of ammunition.


II.   ARGUMENT

      A.   The Bail Reform Act

        Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq.,
federal courts must order a defendant's pre-trial detention upon
determining that "no condition or combination of conditions would
reasonably assure the appearance of the person as required and

the safety of any other person and the community[.]"  18 U.S.C. §
3142(e).  A finding of dangerousness must be supported by clear
and convincing evidence.  See United States v. Rodriguez, 950
F.2d 85, 88 (2d Cir. 1991); United States v. Chimurenga, 760 F.2d
400, 405 (2d Cir. 1985).  A finding of risk of flight must be
supported by a preponderance of the evidence.  See Chimurenga,
760 F.2d at 405.

         The Bail Reform Act lists the following four factors as
relevant to the determination of whether detention is
appropriate:

         (1) the nature and circumstances of the offense
         charged, including whether the offense is a crime of
         violence, a violation of section 1591, a Federal crime
         of terrorism, or involves a minor victim or a
         controlled substance, firearm, explosive, or
         destructive device;

         (2) the weight of the evidence against the person;

         (3) the history and characteristics of the person,
         including--

             (A) the person's character, physical and mental
         condition, family ties, employment, financial
         resources, length of residence in the community,
         community ties, past conduct, history relating to
         drug or alcohol abuse, criminal history, and
         record concerning appearance at court proceedings; and

             (B) whether, at the time of the current offense or
         arrest, the person was on probation, on parole, or on
         other release pending trial, sentencing, appeal, or
         completion of sentence for an offense under Federal,
         State, or local law; and

         (4) the nature and seriousness of the danger to any
         person or the community that would be posed by the
         person's release.

Title 18, United States Code, Section 3142(g).

     B.   Factors Supporting Detention

          1.   Presumption of Dangerousness and Risk of Flight

          In a case in which the defendant is charged with one of

9

the crimes enumerated in Section 3142(f)(1), "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." Title 18, United States Code, Section 3142(e)(3). To properly rebut this presumption, the defendant needs to show that "the specific nature of the crimes charged or ... something about their individual circumstances" establishes the defendant is not a danger or likely to flee. United States v. Dominquez, 783 F.2d 702, 707 (7th Cir. 1986). Moreover, any attempt by the defendant to defeat the presumption does not eliminate the presumption entirely. See United States v. Hare, 873 F.2d 796, 798 (5th Cir. 1989) ("presumption is not a mere 'bursting bubble' that totally disappears from the judge's consideration after the defendant comes forward with evidence"). The presumption remains as one factor of many to be considered by the judicial officer in relation to the congressional paradigm. See United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987); United States v. Williams, 753 F.2d 329 (4th Cir. 1985) (court erred in failing to take into account drug dealing as a danger to the community).

Counts One through Eight of the indictment charge narcotics trafficking offenses with a maximum penalty of more than 10 years. Thus, for any of the defendants charged in those counts, there is a presumption that they should be detained as both a risk of flight and a danger to the community. "In a narcotics case where the presumption is triggered, a real burden to show specific facts rebutting the presumption falls to the defendant." United States v. Aiello, 598 F. Supp. 740, 744-45 (S.D.N.Y. 1984).

2.   Nature and Circumstances of the Offense

The first factor identified by the Bail Reform Act is the nature and circumstances of the offense - particularly, whether the charges involve violence, firearms, controlled substances and/or are international in scope.

The defendants are members and associates of a vast international drug trafficking Syndicate that has been in existence for more than a decade and has members on three continents and operations in at least ten different countries. The illegal narcotics distributed worldwide by Syndicate members have a retail value of more than $500,000,000, conservatively. Many of the defendants also face charges for using firearms and violence to further their criminal objectives. For such "major drug traffickers, even a large bond may be just a cost of doing business." United States v. Valdivia, 104 F. Appx. 753, 755 (1st

10

Cir. 2004).

In addition, based on the immense quantity of drugs involved and the laundering of tens of millions of dollars in drug proceeds, the defendants all face substantial penalties if convicted. The possibility of a severe sentence is an important factor in assessing a defendant's incentive to flee. See United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond to Mexico); United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight,"); United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms of 105 years' imprisonment created potent incentives to flee); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight).

Nearly all of the defendants face a mandatory minimum sentence of at least 10 years in prison with a maximum sentence of life. Criminal history, leadership roles, use of firearms and other enhancements guarantee that the advisory Guidelines range will be even higher. Even the defendants charged solely in the money laundering conspiracy face Guidelines ranges at or exceeding the statutory maximum penalty of 20 years.

3.   Weight of the Evidence

Where the evidence of guilt is strong, it provides "a considerable additional incentive to flee." United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993); see also   United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased").

The evidence against the defendants here is overwhelming. Over the course of the investigation, agents intercepted approximately 14 months of wire and electronic communications on more than 30 cellular telephones used by Syndicate members and associates in New York and other locations in the United States. Syndicate members have been captured on hundreds of hours of video and audio recordings engaging in and discussing the importation, exportation and distribution of massive quantities of illegal narcotics, the payment of millions of dollars in drug proceeds and the use of violence and threats

11

of violence to collect drug debts and deter potential witnesses from cooperating with the government.

Agents have made more than two dozen seizures of narcotics and narcotics proceeds, including, but not limited to:

- Feb. 25, 2007 - Seizure of 943 pounds of marijuana imported from Mexico;

- Mar. 1, 2007 - Seizure of $209,000 in drug proceeds being transported to Mexico to obtain another shipment of marijuana;

- June 6, 2008 - Seizure of $140,000 in drug proceeds intended to be used to purchase the first 10 kilograms of a 200-kilogram cocaine deal;

- Apr. 16, 2009 - Seizure of 20 pounds of marijuana during a car stop in Dutchess County, New York;

- Dec. 9, 2009 - Seizure of 290 pounds of marijuana from a Brooklyn warehouse operated by Syndicate associates;

- Jan. 17, 2010 - Seizure of $1,271,394 in drug proceeds in Manhattan;

- May 13, 2010 - Seizure of 24 kilograms of liquid cocaine in Lima, Peru;

- May 23, 2010 - Seizure of 20 pounds of marijuana by NJ State Police during a car stop;

- June 8, 2010 - Seizure of a loaded handgun and $29,000 in drug proceeds from GJEVELIN BERISHA's residence;

- July 2, 2010 - Seizure of $180,000 in drug proceeds in Manhattan;

- Oct. 1, 2010 - Seizure of a loaded firearm from LUKAJ in Yonkers, New York;

- Oct. 5, 2010 - Seizure of $1,041,990 in drug proceeds in Boston;

- Oct. 13, 2010 - Seizure of $155,000 in drug proceeds in the Bronx;

- Oct. 22, 2010 - Seizure of $497,955 in drug proceeds in

12

California;

- Oct. 27, 2010 - Seizure of 160 pounds of marijuana from a Brooklyn warehouse operated by Syndicate associates;

- Nov. 8, 2010 - Seizure of 38 marijuana plants from a Florida grow house operated by Syndicate associates;

- Nov. 18, 2010 - Seizure of $672,755.00 in drug proceeds in California;

- Dec. 4, 2010 - Seizure of $210,280 in drug proceeds, 1 kilogram of cocaine and numerous firearms from a stash house in California operated by Syndicate associates;

- Jan. 25, 2011 - Seizure of 120 marijuana plants and 10 pounds of "cut" marijuana from two Georgia grow houses operated by Syndicate associates;

- Jan. 27, 2011 - Seizure of tractor trailer with 70 pounds of marijuana imported from Toronto, Canada;

- Feb. 3, 2011 - Seizure of 30 pounds of marijuana during a car stop in New Jersey;

- Mar. 11, 2011 - Seizure of $300,000 in drug proceeds on Long Island;

- Apr. 21, 2011 - Seizure of 70 pounds of marijuana from a tractor trailer being driven from Vancouver, Canada;

- Apr. 23, 2011 - Seizure of marijuana during a car stop in Yonkers, New York; and

- June 23, 2011 - Seizure of 200 oxycodone pills in the Bronx;

        In addition, searches executed on numerous Syndicate-controlled properties and vehicles resulted in the recovery of extensive physical and documentary evidence, including:

- Money laundering ledgers recovered from LANCE SCHONER and ROBERT BONURA on July 2, 2010 showing more than $4 million in money pickups in less than one month.  The ledger listed the names, phone numbers and amounts picked up from each drug dealer.  The numbers listed on this ledger have been linked to several Syndicate members as well as drug dealers in Boston, California, Colorado and Detroit;

- Drug packaging materials, a loaded firearm, $29,000 in cash and handwritten drug ledgers recovered from a consent search of GJEVELIN BERISHA's apartment on June 8, 2010;

- A bulletproof vest, a heat-sealing machine and drug ledgers recovered from a search of BAJRAM LAJQI's residence on June 8, 2011, following his arrest for the June 4, 2011 shooting;

- Labeled packaging materials recovered from the two Brooklyn warehouses used to store bales of marijuana imported from suppliers in Canada;

- Saved text messages and contact numbers on numerous cellular telephones and blackberry devices seized from Syndicate members; and

- Over $200,000 in cash, one kilogram of cocaine, multiple firearms and ammunition, two vehicles with concealed traps and a myriad of packaging materials, heat sealing machines, heat sealed bags, rubber bands and money counting machines from a California stash house operated by Syndicate associates.

Subpoenaed records from various financial institutions and Brinks Global Services also document the Syndicate's movement of tens of millions of dollars in cash proceeds from narcotics sales in New York to California, where the cash was used to purchase cocaine for exportation into Canada. The cocaine was then sold in Canada at nearly double the price and the proceeds were used to fund new shipments of hydroponic marijuana into the United States. This trade-based money laundering and narcotics trafficking circle generated enormous profits. Indeed, during a mere eight-month period in 2010, documents prove that the Syndicate transported more than $12 million dollars in bulk cash from New York to California.

Given the strength of the evidence against them and the sizeable penalties they face upon conviction, all of the defendants have a powerful incentive to flee.

        4.  <u>History and Characteristics of the Defendants</u>

In addition to the severe and sweeping charges they face in the instant prosecution, the prior history and characteristics of many Syndicate members establish their inherent risk of flight and dangerousness - particularly to potential witnesses.

14

**Foreign Ties and Access to Substantial Resources**

Federal courts have repeatedly recognized that "[f]light to avoid prosecution is particularly high among persons charged with major drug offenses," because "drug traffickers often have established ties outside the United States . . . [and] have both the resources and foreign contacts to escape to other countries." United States v. Jessup, 757 F.2d 378, 384 (1st Cir. 1985)(quoting S.Rep. No. 225, at 20 (1983), reprinted in 1984 U.S.C.A.N. 1, 23).  This is nowhere more evident than in the type of transnational organized crime which the Syndicate has engaged in for more than a decade, which spans three continents and ten different countries and has generated more than half a billion dollars in gross proceeds from the sale of potent controlled substances.

In additional to criminal associates in multiple foreign countries, most of the defendants also have family members living abroad and a history of frequent international travel.  Further, many of the defendants are foreign citizens who will be deported following their conviction, and thus have even less of an incentive to remain to face the charges against them.

In sum, the defendants have the means, motive and opportunity to flee the country and should be detained without bail.  See United States v. Stanford, 341 F. Appx. 979, 983 (5th Cir. 2009) (holding that the defendant's financial resources, international network and frequent foreign travel supported the district court's determination that the defendant was a flight risk and should be detained); United States v. Botero, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) (finding pretrial detention warranted where the defendant had "considerable means and foreign connections which would make it possible for him to escape to other countries with relative ease in order to avoid prosecution for offenses punishable by lengthy prison sentences"); see also United States v. Quartermaine, 913 F.2d 910, 917 (11th Cir. 1990) (The government established by a preponderance of the evidence that no condition or set of conditions will reasonably assure defendant's presence at trial because his ties to the community did not outweigh the presumption plus the evidence of his financial assets outside the country and his family tie to Honduras, particularly in light of the potential maximum sentence of life plus sixty years that he faced under the indictment).

**History of Bench Warrants and Parole Violations**

Under § 3142(g)(3)(A), a history of bench warrants is a factor counseling against pretrial release.  Similarly, a

defendant's commission of the charged crime while on probation or some type of judicial monitoring is specifically enumerated in § 3142(g)(3)(B).  As one district court judge in this Circuit explained:

> Every state conviction accompanied by a conditional discharge sentence imposes a condition that the defendant not engage in new criminal behavior within a specified period. A defendant who violates that condition demonstrates a total lack of respect for the court that imposed it. Every sentence of probation or parole requires a defendant to meet judicially imposed conditions, and violations of either are further evidence of a defendant's inability to comply with judicial mandates and supervision. Evidence of new criminal behavior while other charges are pending inevitably leads to the conclusion that a defendant places his own self-interests above that of the community. In turn, the community has a right to expect courts to protect it. Evidence of bench warrants issued following a defendant's failure to appear demonstrates not only a defendant's flight potential, but also his inability to meet the court's demands.

United States v. Barnett, 2003 WL 22143710, *12 (N.D.N.Y. Sept. 17, 2003).

          As described in more detail below, several defendants have a lengthy history of bench warrants and many were on parole, supervised release, probation, conditional discharge status or release pending trial when they committed some or part of the offenses charged in the instant superseding indictment. Consequently, this factor strongly supports detention with respect to those defendants.  See United States v. Vorrice, 277 F. Appx. 762, 764 (10th Cir. 2008) (holding that the defendant was a danger to the community and must be detained because he was arrested for the instant offense while on probation for a prior offense, showing that he had failed to follow the courts orders); United States v. Illas-Pellot, 215 F.3d 1312 (1st Cir. 2000) (holding that defendant posed a risk of flight and a danger to the community where he allegedly committed a serious drug crime while he was on probation for another offense); United States v. Jones, 566 F.Supp. 2d 288, 292 (S.D.N.Y. 2008) ("based upon [defendant's] criminal history, past failures to abide by conditions of probation and supervised release, and his refusal to secure gainful employment, the History Factor weighs in favor of detention"); Miller v. Walker, 413 F. Supp. 2d 251, 256 (W.D.N.Y. 2006) (holding that substantial bail was not excessive

16

because of defendant's bench warrant history and predicate felon status).

       5.  <u>Danger to the Community</u>

      The last factor the Court must consider is the nature and seriousness of the danger to any person or the community that would be posed by the defendants' release.

      The legislative history of the Bail Reform Act indicates that danger to the community is not limited to violent crimes, but to any crimes that would harm the community. <u>See</u> Senate Report at 3195-96 ("language referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."); <u>see also</u> <u>United States v. Salerno</u>, 481 U.S. 739, 742 (1987) (noting that the Bail Reform Act was formulated by Congress as "the solution to a bail crisis in federal courts" created by the "alarming problem of crimes committed by persons on release") (internal citations omitted).  Thus, the Second Circuit has held that "[i]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger.'"  <u>United States v. Leon</u>, 766 F.2d 77, 81 (2d Cir. 1985).

      Where, as here, defendants have demonstrated a pattern of prior criminal conduct involving drugs, guns and violence (including while on probation and pretrial release), detention is not only justified – it is necessary to protect the community from further crimes by the defendants.  <u>See</u>, <u>e.g.</u>, <u>United States v. Marino</u>, 396 F. Appx. 728, 730 (2d Cir. 2010) (holding that the defendant's past violent activities, together with his ongoing ability to direct the conduct of criminal confederates, provided clear and convincing evidence of the present danger the defendant posed); <u>United States v. Colombo</u>, 777 F.2d 96, 98-99 (2d Cir. 1985) ("Where there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate."); <u>United States v. Wilson</u>, 257 F.2d 796, 797 (2d Cir. 1958) (detaining defendant because "[t]he pattern of [the defendant's] career to date indicates that whenever released he will soon be selling heroin again").

      As discussed above, Syndicate members have routinely used firearms and acts of violence to facilitate their criminal activities including several murder, robbery and kidnapping plots

that were only thwarted by timely law enforcement intervention. The Second Circuit has repeatedly stated that even elaborate conditions of home detention cannot substitute for incarceration where the defendant is violent or cannot be trusted to comply with the conditions of release.  See United States v. Millan, 4 F.3d 1038, 1048-49 (2d Cir. 1993) (home detention and electronic surveillance can be circumvented); United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("home detention and electronic monitoring at best 'elaborately replicate a detention facility without the confidence of security such a facility instills'") (quoting United States v. Gotti, 776 F. Supp. 666, 672 (E.D.N.Y. 1991)); see also United States v. Tortora, 922 F.2d 880, 886-87 (1st Cir. 1990) (elaborate conditions dependent upon good faith compliance were insufficient where the defendant's violent history provided no basis for believing that good faith would be forthcoming).

          Even more troubling than the violence itself, the Syndicate freely employs such brutality for the specific purpose of intimidating, eliminating or retaliating against witnesses and law enforcement agents.  At least three witnesses to Syndicate crimes were murdered or threatened with murder to prevent them from cooperating with law enforcement or testifying at trial. Countless other witnesses have been scared into silence by the Syndicate's reputation for violence.[4]  Syndicate members even initiated the savage beating of an individual they believed was a law enforcement agent who was following them.

          Syndicate members have also attempted to obstruct the administration of justice in other ways.  For example, following the arrest of EMILJAN REXHA in Peru with 26 kilograms of the Syndicate's cocaine, MAL REXHA asked GJAVIT THAQI to see if he could use his criminal contacts in South America to free him. Wiretap intercepts captured THAQI's attempt to have a criminal associate in Peru bribe Peruvian officials to have EMILJAN REXHA released.  Similarly, Syndicate members have repeatedly made

_____

          [4] As just one example of this phenomenon, the June 4, 2011 attempted murder by BAJRAM LAJQI and CARLOS ALVAREZ took place in the middle of a crowd of restaurant patrons, bouncers and onlookers.  Information obtained during the course of the investigation revealed that numerous Syndicate members, included the shooters, were frequent patrons of the bar/restaurant where the attempted hit took place.  Yet, when questioned by law enforcement officers, only a small handful of witnesses "remembered" anything about the participants to the shooting or any details of the incident.

attempts to bribe foreign officials in an effort to free Syndicate leader ARIF KURTI from an Albanian prison, where he is serving a sentence for heroin trafficking.  While none of these attempts were successful, they further demonstrate the lengths to which the Syndicate will go to prevent the arrest, prosecution and incarceration of its members and associates.

The Second Circuit has directly addressed the issue of pre-trial detention in assuring the safety of the community against a defendant who has engaged in obstruction of justice. In United States v. LaFontaine, 210 F.3d 125, 2000 WL 373949, *8-9 (2d Cir. Apr. 12, 2000), the district court revoked the defendant's bail based on evidence that LaFontaine had sought to influence witnesses while released on bond.  The defendant appealed, arguing that in the context of a non-violent, white-collar case, elaborate release conditions, including home detention, electronic monitoring, phone tap and relocation to a different state would assure the safety of the community.  Id. at *8.  The Second Circuit upheld the lower court's revocation of bail.  The Court ruled that "we have held that a record of violence or dangerousness [in the sense of violence or threats aimed against witnesses] is not necessary to support pre-trial detention."  Id.  (citing Ferranti, 66 F.3d at 543 and United States v. Rodriquez, 950 F.2d 85, 89 (2d Cir. 1991)).  The Court noted that in United States v. Gotti, 794 F.2d 773, 779 & n.9 (2d Cir. 1991), the Second Circuit held that a "single incident of witness tampering constituted a 'threat to the integrity of the trial process, rather than more generally a danger to the community,' and was sufficient to revoke bail."  LaFontaine, 2000 WL 373949, at *9 (quoting Gotti, 794 F.2d at 779 n.5).  The court further observed that, as in Gotti, "pre-trial detention was even more justified in cases of violations related to the trial process (such as witness tampering) than in cases where the defendant's past criminality was said to support a finding of general dangerousness."  LaFontaine, 2000 WL 373949, at *9; see also United States v. Agnello, 101 F. Supp. 2d 108 (E.D.N.Y. 2000) (reversing magistrate judge and ordering detention based, in part, on evidence that the defendant attempted to obstruct justice in a prior case).

As in Gotti and LaFontaine, attempts by Syndicate members to influence witnesses is a direct "threat to the integrity of the trial process" and alone justifies their detention.  LaFontaine, 2000 WL 373949, at *9 (quoting Gotti, 794 F.2d at 779 n.5).

C.   <u>Individual Assessment of Each Defendant</u>

1   <u>GJAVIT THAQI</u>

Syndicate leader GJAVIT THAQI is charged in Counts One through Ten of the superseding indictment, which subjects him to a mandatory minimum penalty of 25 years and a maximum penalty of life imprisonment.  Due to his role in the offense, use of firearms and criminal history, THAQI will face an estimated advisory Guidelines range of life imprisonment if convicted of all offenses.  THAQI has three criminal convictions: a 1991 conviction for Conspiracy to Transport and Deal Firearms in the Eastern District of New York (for which he was sentenced to 3 years' imprisonment); a conviction in Florida for cocaine trafficking; and a 2008 conviction for Passport Fraud in the Northern District of Texas (for which he was sentenced to 10 months' imprisonment).  THAQI was on Supervised Release for this most recent conviction when he committed a number of the narcotics offenses set forth in the indictment.  THAQI was also personally engaged in efforts to obstruct justice and secure the release of imprisoned Syndicate members ARIF KURTI and EMILJAN REXHA through the payment of bribes to foreign officials.

THAQI also has substantial foreign ties, with criminal associates in Canada, Mexico, Colombia, Peru, Venezuela, the Carribean, Spain and Albania.  He was born in Italy, has no official status in the United States[5] and has family members abroad in at least three different countries.  THAQI has also made frequent international trips to, among other locations: Canada and Turks & Cacaos.

Accordingly, GJAVIT THAQI should be detained as both a danger to the community and a risk of flight.

2   <u>SHKELQIM BAKRAQI</u>

SHKELQIM BAKRAQI is charged in Counts Two, Three, Five through Seven and Nine of the Superseding indictment, which subjects him to a mandatory minimum penalty of 10 years and a

---

[5] THAQI was born into an ethnic Albanian family living in Kosovo.  Since his actual birth occurred in Italy, however, he has no country of origin for purposes of deportation.  Thus, although he was subject to an Order of Deportation, U.S. officials have been unsuccessful in removing him from the country.

maximum penalty of life imprisonment.  If convicted, he faces an estimated advisory Guidelines range of 188 to 235 months. BAKRAQI was also personally involved in the Syndicate's attempt to threaten, cajole, bribe and finally murder a drug associate in order to prevent him from cooperating.

BAKRAQI also has substantial foreign ties.  BAKRAQI was born in Kosovo and has numerous family members residing abroad in Kosovo, Albania and Germany.  BAKRAQI has also made frequent international trips.

Accordingly, SHKELQIM BAKRAQI should be detained as both a danger to the community and a risk of flight.

3    ROBERT BONURA

Robert Bonura is charged in Count Nine of the Superseding indictment.  Although there is no mandatory minimum sentence, BONURA faces an estimated advisory Guidelines range that extends beyond the 240-month statutory maximum penalty (235 to 293 months) based on the sheer volume of laundered narcotics funds.

Based on his connection to the Syndicate, and his membership in a Canadian-based professional money laundering organization, BONURA has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.

Accordingly, BONURA's release should be contingent upon a substantial bond, secured by property and signatures from several financially responsible suretors.  BONURA should also be subject to home detention with electronic monitoring.

4    JOHN CEKAJ

JOHN CEKAJ is charged in Counts Two, Three and Five through Seven of the Superseding indictment, which subjects him to a mandatory minimum penalty of 10 years and a maximum penalty of life imprisonment.  If convicted, CEKAJ faces an estimated advisory Guidelines range of 155 to 188 months.  CEKAJ has an extensive criminal record including arrests for burglary, illegal entry, possession of burglary tools, criminal possession of a loaded firearm, and illegal entry with intent to commit a crime, and a 1994 conviction for attempted burglary.

As a member of the Syndicate, CEKAJ has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries. CEKAJ also has extensive personal ties to foreign countries, particularly Kosovo, to which he has traveled on numerous occasions.

Accordingly, JOHN CEKAJ should be detained as both a danger to the community and a risk of flight.

5     <u>MARTINO CEKAJ</u>

MARTINO CEKAJ is charged in Counts Two, Three, Five through Seven and Ten of the Superseding indictment, which, as a predicate drug felon, subjects him to a mandatory minimum penalty of 30 years and a maximum penalty of life imprisonment. CEKAJ has a 1994 conviction for aggravated assault, and a 1997 conviction for narcotics trafficking for which he was sentenced to 66 months in prison. CEKAJ was also arrested on January 25, 2008 and charged with attempted murder. He was eventually acquitted at trial after Syndicate members threaten the victim-witness, who disappeared before he could testify. As discussed above, CEKAJ committed numerous acts of violence on behalf of the Syndicate, including the vicious beating of a suspected law enforcement officer. Moreover, at the time of his arrest, CEKAJ was actively involved in a plot to murder a drug associate in order to prevent him from cooperating with the government.

As a member of the Syndicate, CEKAJ has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries. CEKAJ also has extensive personal ties to foreign countries, particularly Kosovo, to which he has traveled on numerous occasions. CEKAJ returned from his last trip to Kosovo only a few weeks before his arrest.

Accordingly, MARTINO CEKAJ should be detained as both a danger to the community and a risk of flight.

6     <u>GIOVANNI DIFUCCIA</u>

GIOVANNI DIFUCCIA is charged in Counts Two, Three, Eight and Nine of the Superseding indictment, which subjects him to a mandatory minimum penalty of 10 years and a maximum penalty of life imprisonment. DIFUCCIA has a 2001 conviction for criminal sale of a controlled substance and a 2003 federal conviction for firearm trafficking, for which he received 46

22

months in prison.  As a predicate drug felon, DIFUCCIA could face an additional 10 year mandatory minimum for a total of 20 years. DIFUCCIA also has a history of bench warrants.

As a member of the Syndicate, DIFUCCIA has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.

Accordingly, GIOVANNI DIFUCCIA should be detained as both a danger to the community and a risk of flight.


7    <u>BRIAN DUBLYNN</u>

BRIAN DUBLYNN is charged in Counts Two, Three, Five through Seven and Nine of the Superseding indictment, which subjects him to a mandatory minimum penalty of 10 years and a maximum penalty of life imprisonment.  If convicted, he faces an estimated advisory Guidelines range of 235 to 293 months.  BRIAN DUBLYNN has a 2011 arrest for aggravated assault; a 2005 arrest for menacing; a 2003 arrest for assault and a 2001 arrest for assault.  He is currently on pretrial release for the pending 2011 assault charge.  At the time of his arrest, agents also arrested a criminal associate who was observed taking a bag out of DUBLYNN's residence.  The bag was found to contain a firearm.

As a member of the Syndicate, DUBLYNN has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.

Accordingly, BRIAN DUBLYNN should be detained as both a danger to the community and a risk of flight.


8    <u>ANGELO GERMANO</u>

ANGELO GERMANO is charged in Counts Two, Three and Five through Eight of the Superseding Indictment, which subjects him to a mandatory minimum penalty of 10 years and a maximum penalty of life imprisonment.  If convicted, he faces an estimated advisory Guidelines range of 235 to 293 months.  GERMANO has a May 29, 2011 arrest for criminal possession of marijuana.  He is currently on pretrial release for that pending case.

As a member of the Syndicate, GERMANO has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.

23

Accordingly, ANGELO GERMANO should be detained as both a danger to the community and a risk of flight.

9   JETON GJIDIJA

JETON GJIDIJA is charged in Counts Two, Three, Five through Seven and Nine of the Superseding Indictment, which subjects him to a mandatory minimum penalty of 10 years and a maximum penalty of life imprisonment.  If convicted, GJIDIJA faces an estimated advisory Guidelines range of 151 to 188 months.  GJIDIJA has a 2002 arrest in Ontario, Canada for attempted murder.  At the time of his arrest, GJIDIJA was found to be in possession of a Beretta 9mm handgun that was manufactured and purchased in the United States.  GJIDIJA also has a 2009 conviction for possession of stolen property.

At the time of his arrest, agents executed a search warrant on GJIDIJA's residence and recovered ten firearms and more than 350 rounds of ammunition.

As a member of the Syndicate, GJIDIJA has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.  In particular, GJIDIJA has family members living in Canada and has made multiple foreign trips.

Accordingly, JETON GJIDIJA should be detained as both a danger to the community and a risk of flight.

10   LEE KARAQI

LEE KARAQI is charged in Counts Two, Three and Nine of the Superseding Indictment, which subjects him to a mandatory minimum penalty of 10 years and a maximum penalty of life imprisonment.  At the time of his arrest, agents executed a search warrant on KARAQI's business office and recovered a handgun.

As a member of the Syndicate, KARAQI has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.

Accordingly, LEE KARAQI should be detained as both a danger to the community and a risk of flight.

24

11   ROBERT KARAQI

ROBERT KARAQI is charged in Counts Two, Three, Five through Seven and Nine of the Superseding Indictment, which subjects him to a mandatory minimum penalty of 10 years and a maximum penalty of life imprisonment.  If convicted, KARAQI will face an estimated advisory Guidelines range of 188 to 235 months.

As a member of the Syndicate, KARAQI has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.

Accordingly, ROBERT KARAQI should be detained as both a danger to the community and a risk of flight.

12   HASAN KURTI

HASAN KURTI is charged in Counts Two, Three and Five through Ten of the Superseding indictment, which subjects him to a mandatory minimum penalty of 15 years and a maximum penalty of life imprisonment.  If convicted, KURTI faces an estimated advisory Guidelines range of 188 to 235 months.  KURTI was also personally engaged in efforts to obstruct justice and secure the release of imprisoned Syndicate leader ARIF KURTI, his brother, through the payment of bribes to foreign officials.

KURTI has extensive foreign ties, with criminal contacts in Kosovo, Albania, Canada, Spain and South America. KURTI was born in Kosovo and has family members living abroad in several foreign countries, including Kosovo, Albania and Canada. KURTI has made numerous international trips.

Accordingly, HASAN KURTI should be detained as both a danger to the community and a risk of flight.

13   SELMAN LAJQI

SELMAN LAJQI is charged in Counts Two, Three and Five through Ten of the Superseding indictment, which subjects him to a mandatory minimum penalty of 15 years and a maximum penalty of life imprisonment.  If convicted, LAJQI faces an estimated advisory Guidelines range of 188 to 235 months.  LAJQI was arrested for second degree murder by the NYPD, but the case against him was sealed for unknown reasons.  As discussed above, LAJQI was personally involved in the plot to murder a drug associate to prevent him from cooperating with the government and

threatened to kidnap members of the drug associate's family in Kosovo if he testified against LAJQI's brother.  At the time of his arrest, LAJQI refused to comply with orders from the arresting agents to get up and raise his hands above his head; and physically resisted when agents attempted to handcuff him.

LAJQI has extensive foreign ties, with criminal contacts in Kosovo, Albania and Canada.  LAJQI was born in Kosovo and has family members living abroad in multiple foreign countries including Kosovo and Germany.  LAJQI has also made frequent international trips.

Accordingly, SELMAN LAJQI should be detained as both a danger to the community and a risk of flight.


14   <u>ALESSANDRO LATINO</u>

ALESSANDRO LATINO is charged in Count Nine of the Superseding indictment.  Although there is no mandatory minimum sentence, LATINO faces an estimated advisory Guidelines range that extends beyond the 240-month statutory maximum penalty (235 to 293 months) based on the sheer volume of laundered narcotics funds.

Based on his connection to the Syndicate, and his membership in a Canadian-based professional money laundering organization, LATINO has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.  In fact, Brinks records document that LATINO and his co-conspirators picked up more than $15 million dollars in drug proceeds, all of which was used to purchase cocaine from Mexican drug cartels for export to Canada.

Accordingly, ALESSANDRO LATINO should be detained as a risk of flight.


15   <u>NIKOLA LUKAJ</u>

NIKOLA LUKAJ is charged in Counts Two, Three, Five through Seven and Ten of the Superseding indictment, which subjects him to a mandatory minimum penalty of 15 years and a maximum penalty of life imprisonment.  If convicted, LUKAJ faces an estimated advisory Guidelines range of 235 to 293 months. LUKAJ has a 1992 conviction for attempted murder and assault with intent to cause serious injury with a weapon (for which he received a sentence of 42 months to 128 months); a 1988

26

conviction for assault with intent to cause serious injury and harassment; and pending criminal charges for multiple 2010 arrests involving criminal possession of a firearm, possession of cocaine, DWI and possession of marijuana.  As discussed above, LUKAJ was arrested by law enforcement agents in possession of a loaded firearm after agents intercepted wiretap calls in which LUKAJ stated he was going to get his gun and rob a drug customer who owed him a debt.  After being released on bail, LUKAJ instructed one of his criminal associates to steal his vehicle out of the police impound.  On April 23, 2011, while still released on bail for the firearm arrest, LUKAJ was again arrested by Yonkers police officers – this time while in possession of distribution sized quantities of marijuana.

As a member of the Syndicate, LUKAJ has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.

Accordingly, NIKOLA LUKAJ should be detained as both a danger to the community and a risk of flight.

16    <u>NICHOLAS MASI</u>

NICHOLAS MASI is charged in Counts Two through Nine of the Superseding Indictment, which subjects him to a mandatory minimum penalty of 10 years and a maximum penalty of life imprisonment.  If convicted, MASI faces an estimated advisory Guidelines range of 188 to 235 months.  At the time of his arrest, agents executed a search warrant on MASI's home residence and recovered two firearms and distribution quantity amounts of marijuana.

As one of the primary financial backers for the Syndicate's drug activities in New York, MASI has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.

Accordingly, NICHOLAS MASI should be detained as both a danger to the community and a risk of flight.

17    <u>FAIK MEHMETI</u>

FAIK MEHMETI is charged in Counts Two, Three, Five through Seven and Ten of the Superseding Indictment, which subjects him to a mandatory minimum penalty of 15 years and a maximum penalty of life imprisonment.  If convicted, MEHMETI

27

faces an estimated advisory Guidelines range of 262 to 327
months.  FAIK MEHMETI was arrested on August 5, 1995 and charged
with attempted murder.  He pled to the reduced charge of assault
with intent to cause physical injury with a weapon and was
sentenced to 1 year in prison.  MEHMETI was also convicted in
1997 for assault and sentenced to 3 years probation.  As
discussed above, MEHMETI participated in a vicious beating of a
suspected law enforcement officer and was actively involved in
the plot to murder a drug associate to prevent him from
cooperating.

        As a member of the Syndicate, MEHMETI has access to
substantial, untraceable financial resources and criminal
contacts in multiple foreign countries.

        Accordingly, FAIK MEHMETI should be detained as both a
danger to the community and a risk of flight.


        18   <u>FATMIR MEHMETI</u>

        FATMIR MEHMETI is charged in Counts Two, Three and Five
through Seven of the Superseding Indictment, which subjects him
to a mandatory minimum penalty of 10 years and a maximum penalty
of life imprisonment.  If convicted, MEHMETI faces an estimated
advisory Guidelines range of 188 to 235 months.  FATMIR MEHMETI
has a 2003 arrest for reckless endangerment.  He subsequently
pled guilty to the reduced charge of leaving the scene of an
accident involving a personal injury, a class A Misdemeanor.  As
discussed above, MEHMETI participated in a vicious beating of a
suspected law enforcement officer and was actively involved in
the plot to murder a drug associate to prevent him from
cooperating.

        As a member of the Syndicate, MEHMETI has access to
substantial, untraceable financial resources and criminal
contacts in multiple foreign countries.

        Accordingly, FATMIR MEHMETI should be detained as both
a danger to the community and a risk of flight.


        19   <u>NEFAIL MEHOVIC</u>

        NEFAIL MEHOVIC is charged in Counts Two and Three of
the Superseding indictment, which subjects him to a mandatory
minimum penalty of 10 years and a maximum penalty of life
imprisonment.  If convicted, MEHOVIC faces an estimated advisory

Guidelines range of 188 to 235 months.  NEFAIL MEHOVIC has a 2005 conviction for assault in the second degree (pled down from the original charges of attempted murder, assault with a deadly weapon and criminal possession of a weapon), for which he received a sentence of 2 years in prison.  MEHOVIC also has a 2001 conviction for attempted assault.

MEHOVIC has extensive foreign ties.  He is a citizen of Kosovo and still has family residing there.  MEHOVIC has also made numerous international trips.

Accordingly, NEFAIL MEHOVIC should be detained as both a danger to the community and a risk of flight.


20    MAGDALENA NIKOLLAJ

MAGDALENA NIKOLAJ is charged in Count Nine of the Superseding indictment.  Although there is no mandatory minimum sentence, NIKOLLAJ faces an estimated advisory Guidelines range of 78 to 97 months based on the volume of laundered narcotics funds.

Based on her connection to the Syndicate, NIKOLLAJ has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.

Accordingly, NIKOLLAJ's release should be contingent upon a substantial bond, secured by property and signatures from several financially responsible suretors.  NIKOLLAJ should also be subject to home detention with electronic monitoring.


21    MAL REXHA

MAL REXHA is charged in Counts Two, Three and Nine of the Superseding indictment, which subjects him to a mandatory minimum penalty of 10 years and a maximum penalty of life imprisonment.

REXHA is a citizen of Albania and has extensive foreign ties both through family connections and his criminal connections with the Syndicate.

Accordingly, MAL REXHA should be detained as both a danger to the community and a risk of flight.

22   <u>DARIUS RIVERA</u>

DARIUS RIVERA is charged in Counts Two and Three of the
Superseding indictment, which subjects him to a mandatory minimum
penalty of 10 years and a maximum penalty of life imprisonment.
DARIUS RIVERA has a 1992 conviction for cocaine possession; a
1994 conviction for possession of marijuana; a 2001 conviction
for possession of marijuana; and a 2008 conviction for possession
of marijuana.  As a predicate drug felon, RIVERA could be subject
to an additional 10 year mandatory minimum for a total of 20
years.

Based on his connection to the Syndicate, RIVERA has
access to substantial, untraceable financial resources and
criminal contacts in multiple foreign countries.

Accordingly, DARIUS RIVERA should be detained as both a
danger to the community and a risk of flight.


23   <u>ROBERT RUDAJ</u>

ROBERT RUDAJ is charged in Counts Two, Three, Five
through Seven and Ten of the Superseding indictment, which
subjects him to a mandatory minimum penalty of 15 years and a
maximum penalty of life imprisonment.  ROBERT RUDAJ is a career
criminal with more than fifteen arrests and eight convictions,
including, among others: a 2002 conviction for assault with
intent to cause physical injury (for which he received 4 months
incarceration); a 1996 conviction for attempted burglary in the
third degree (for which he received 18 months to 3 years
incarceration); a 1991 conviction for burglary in the second
degree (for which he received 4 years' incarceration); and a 1990
conviction for attempted assault with intent to cause
disfigurement or dismemberment (for which he received 16 months
to 4 years' incarceration).  RUDAJ also has pending criminal
cases stemming from a May 2009 arrest for criminal possession of
a firearm under the alias "Doka Rudaj," two separate arrests in
2010 for marijuana possession, and a 2011 arrest for burglary and
illegal entry with intent to commit a crime. RUDAJ also has a
history of bench warrants.  If convicted, RUDAJ faces an
estimated advisory Guidelines range of 360 months to Life.

Based on his connection to the Syndicate, RUDAJ has
access to substantial, untraceable financial resources and
criminal contacts in multiple foreign countries.

Accordingly, ROBERT RUDAJ should be detained as both a danger to the community and a risk of flight.

24    <u>LANCE SCHONER</u>

LANCE SCHONER is charged in Count Nine of the Superseding indictment.  Although there is no mandatory minimum sentence, SCHONER faces an estimated advisory Guidelines range that extends beyond the 240-month statutory maximum penalty (235 to 293 months) based on the sheer volume of laundered narcotics funds.  Records from Brinks Global Security document that is just a one-year period, SCHONER personally transported more than $15 million dollars in narcotics proceeds from New York to California, where it was used to purchase cocaine from Mexican drug cartels.

Based on his connection to the Syndicate, and his membership in a Canadian-based professional money laundering organization, SCHONER has access to substantial, untraceable financial resources and criminal contacts in multiple foreign countries.  In particular, SCHONER recently purchased an $800,000 home, paying more than $400,000 in cash, despite having little to no legitimate income.  SCHONER also created and maintained several sham businesses that purported to sell jewelry, but were actually fronts for moving tens of millions of dollars in laundered drug proceeds.  SCHONER has extensive contacts in Canada and has made multiple international trips.

On July 2, 2010, SCHONER and ROBERT BONURA were arrested in possession of $180,000 in narcotics proceeds that were given to them by GJAVIT THAQI, NICHOLAS MASI and ROBERT KARAQI.  Agents also found detailed ledgers establishing that SCHONER had picked up more than $4 million dollars from other drug dealers in the span of just a few days, the bulk of which had already been shipped to California.  SCHONER lied to agents about the source of the funds, claiming that the $180,000 was from his jewelry business.  SCHONER later filed a civil claim in the Southern District of New York seeking to recover the seized $180,000.  During the course of that civil proceeding, Schoner filed two separate sworn affidavits in which he falsely claimed that he was the "lawful owner" of the $180,000 and that the money was from the operation of his jewelry business, "L & M Jewelers" located at 30 Union Avenue, Lakehurst, New Jersey.  In fact, undercover agents visited both the Union Avenue location, and other business addresses listed for SCHONER's sham companies, and at each location they found empty offices with no jewelry, no display cases and no operating business.  Moreover, SCHONER also

31

claimed in a sworn affidavit that the $180,000 seized from him on
July 2, 2010 was from his jewelry business despite the fact that
federal agents physically observed drug traffickers THAQI, KARAQI
and MASI meet with SCHONER and BONURA on a street corner and hand
them a duffel bag containing the $180,000 in cash.  Wire
intercepts surrounding the transaction clearly established that
the cash was being provided to SCHONER in payment for a shipment
of marijuana that THAQI had received the prior week from Canada.

Even more telling, SCHONER filed one of his false
affidavits after being arrested a <u>second</u> time by law enforcement
agents, this time in possession of nearly $300,000 in cash that
was collected from drug dealers on Long Island.  At the time of
his second arrest, SCHONER was carrying a handwritten ledger that
listed types of marijuana strains and the prices at which each
type was available for sale.  Given SCHONER's blatant disregard
for the integrity of the judicial process; his repeated lies to
law enforcement officers, mortgage companies, the Internal
Revenue Service and most importantly, a federal judge in the
SDNY,

Accordingly, LANCE SCHONER should be detained without
bail as a risk of flight and due to his proven inability to abide
by any restrictions the Court might subject him to.

25   <u>LESTER ZABORSKI</u>

LESTER ZABORSKI is charged in Counts Two and Three of
the Superseding indictment, which subjects him to a mandatory
minimum penalty of 10 years and a maximum penalty of life
imprisonment.  ZABORSKI has a 2008 conviction for cocaine
trafficking, a 2004 conviction for possession of a controlled
substance, a 2000 conviction for assault, a 1997 conviction for
reckless endangerment and a 1994 conviction for menacing with a
weapon.  ZABORKSI also has a history of bench warrants.  As a
predicate drug felon, ZABORSKI could be subject to an additional
10 year mandatory minimum, for a total of 20 years.

Based on his connection to the Syndicate, ZABORSKI has
access to substantial, untraceable financial resources and
criminal contacts in multiple foreign countries.

Accordingly, LESTER ZABORSKI should be detained as both
a danger to the community and a risk of flight.

32

26   AGRON ZENELAJ

AGRON ZENELAJ is charged in Counts Two, Three and Eight through Ten of the Superseding indictment, which subjects him to a mandatory minimum penalty of 15 years and a maximum penalty of life imprisonment.  At the time of his arrest, agents executed a search warrant on his home residence and recovered three firearms.

ZENELAJ also has extensive foreign ties.  He is a citizen of Kosovo and still has family members who reside there.

Accordingly, AGRON ZENELAJ should be detained as both a danger to the community and a risk of flight.

III.   Conclusion

For all of these reasons, the government respectfully requests that the defendants MAGDALENA KARAQI's and ROBERT BONURA's release be contingent upon a substantial bond secured by real property, the signature of multiple responsible suretors and strict home detention with electronic monitoring.

The government also requests that a permanent order of detention be entered with respect to the defendants GJAVIT THAQI, SHKELQIM BAKRAQI, JOSEPH BEVILACQUE, JOSEPH BUX, JOHN CEKAJ, MARTINO CEKAJ, GIOVANNI DIFUCCIA, ADRIAN DUBIEL, BRIAN DUBLYNN, ANGELO GERMANO, JETON GJIDIJA, AL KARAQI, LEE KARAQI, ROBERT KARAQI, HASAN KURTI, SELMAN LAJQI, ALESSANDRO LATINO, NIKOLA LUKAJ,FRANK MAHONEY, NICHOLAS MASI, DAVID MCLEAN, FATMIR MEHMETI, FAIK MEHMETI, NEFAIL MEHOVIC, FABIAN MIHAJ, MAL REXHA, DARIUS RIVERA, ROBERT RUDAJ, FADIL SALAJ, LANCE SCHONER, LESTER ZABORSKI and AGRON ZENELAJ.

In the event that the Court is inclined to release the defendant over the government's objection, the government respectfully requests that any such release order be stayed pursuant to 18 U.S.C. § 3142(f) pending the government's request for a detention hearing before the assigned District Judge.


                              Very truly yours,

                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York

                    By:    _____
                              Steven L. Tiscione
                              Richard Tucker
                              Michael Yaeger
                              Assistant U.S. Attorneys
                              (718) 254-6317/6204/6075

cc: Assigned defense counsel (By ECF and hand delivery)
    The Honorable Dora L. Irizzary (By ECF and hand delivery)